## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRITTNEY MILLS, | : | |
| | : | |
| *Plaintiff,* | : | **CIVIL ACTION** |
| v. | : | **No. 14-593** |
| | : | |
| CITY OF PHILADELPHIA, et al., | : | |
| | : | |
| *Defendants.* | : | |

## MEMORANDUM

**Kenney, J.**                                                                              **March 22, 2024**

Presently before the Court is the City of Philadelphia's (the "City") Motion to Preclude the Testimony and Report of Plaintiff's Expert Shaun T. Santos (the "Motion to Preclude") (ECF No. 70) and the City's Motion for Summary Judgment (ECF No. 68).[1]  For the reasons detailed below, the Court will grant in part and deny in part the City's Motion to Preclude and will also grant in part and deny in part the City's Motion for Summary Judgment.  An appropriate Order will follow.

## I.     PROCEDURAL HISTORY[2]

On January 27, 2014, Plaintiff Brittney Mills filed a Complaint against the City, Police Officer Jeffrey Walker, and Police Officers John/Jane Does 1-10.  ECF No. 1.  Judge Stewart

---

[1] Although the Motion to Preclude and the Motion for Summary Judgment were brought by both the City and Officer Timothy Dunne, Dunne was terminated as a defendant following the Court's October 5, 2023 Order granting summary judgment in his favor (ECF No. 103).  Accordingly, the Court treats the Motion to Preclude as brought only by the City, and, consistent with the Court's October 5, 2023 Order and Memorandum, only decides the Motion for Summary Judgment to the extent it pertains to the City.  *See* ECF Nos. 102 at 1 n.2, 103.

[2] The relevant factual background is set forth in the Court's October 5, 2023 Memorandum granting the Officers' summary judgment motions.  *See* ECF No. 102 at 7–15.  In providing the below reasoning, the Court writes primarily for the attorneys and parties—all of whom are well familiar with the background of this case—and therefore will not provide a recitation of the facts again.

Dalzell, to whom this case was originally assigned, subsequently placed it in suspense pending resolution of consolidated cases involving the Narcotics Field Unit ("NFU") that were then-pending before Judge Paul Diamond.  ECF No. 15.  The next day, on August 1, 2014, Plaintiff filed an Amended Complaint—the operative complaint—against the City, Walker, Does 1-6, and substituting Michael Alice, Timothy Dunne, Thomas Liciardello, and John Speiser for Does 7-10.  ECF No. 16.

On September 21, 2015, Liciardello and Speiser filed an Answer to the Amended Complaint.  ECF No. 23.  The City, Alice, and Dunne filed their Answer to the Amended Complaint on December 29, 2015.  ECF No. 27.  On March 29, 2021, Mills requested an entry of default against Walker because he had not yet served an Answer to the Amended Complaint.  ECF No. 39.[3]  That same day, consistent with Federal Rule of Civil Procedure 55(a), the Clerk's office entered a default against Walker.[4]  *See* ECF No. 102 at 1 n.1.

Aside from Walker, each named defendant in this action has filed a motion for summary judgment.  Alice filed a Motion for Summary Judgment seeking to dismiss all of Plaintiff's claims against him on June 20, 2022.  ECF No. 66.  Liciardello and Speiser then filed a separate joint Motion for Summary Judgment seeking to dismiss all of Plaintiff's claims against them on June 24, 2022.  ECF No. 69.  Also on June 24, 2022, the City and Dunne filed a separate joint Motion for Summary Judgment seeking to dismiss all of Plaintiff's claims against them.  ECF No. 68.

---

[3] Plaintiff's counsel originally filed a Motion for a Default Judgment on July 9, 2014 (ECF No. 9), but the Motion for a Default Judgment was premature and was never granted.  *See* ECF No. 102 at 1 n.1.

[4] Mills has not yet moved for a default judgment as required by Federal Rule of Civil Procedure 55(b).

All Motions for Summary Judgment have been resolved, *see* ECF Nos. 102, 103, except the instant Motion for Summary Judgment as it relates to the City (ECF No. 68), and the City's related Motion to Preclude against Plaintiff's municipal liability expert, Shaun T. Santos (ECF No. 70). The below Memorandum addresses these two remaining motions.

## II.   LEGAL STANDARD

### A.   Motion to Preclude

Federal Rule of Evidence ("FRE") 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[5]

---

[5] This language reflects a recent amendment to FRE 702, which took effect as of December 1, 2023. *See* Fed. R. Evid. 702, Advisory Comm. Notes, 2023 Amendments. While "[n]othing in the amendment imposes any new, specific procedures," the purpose of the amendment was to clarify and emphasize (1) the applicability of the "preponderance of the evidence standard," that is, "expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in [FRE 702]," and (2) that "each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.*; *see also Allen v. Foxway Transp., Inc.*, No. 4:21-CV-00156, 2024 WL 388133, at *3 (M.D. Pa. Feb. 1, 2024) (explaining that the amendment was motivated by the Advisory Committee's observation that in "a number of federal cases . . . judges did not apply the preponderance standard of admissibility to Rule 702's requirements of sufficiency of basis and reliable application of principles and methods, instead holding that such issues were ones of weight for the jury," which is an incorrect application of FRE 702 and 104(a) (citation omitted)).

This Rule places district courts in the role of the "gatekeeper," requiring courts to ensure that the expert testimony is both (1) relevant and (2) reliable.  *See David v. Black & Decker (US) Inc.*, 629 F. Supp. 2d 511, 514 (W.D. Pa. 2009) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  In the *Daubert* context, "relevance has been described as one of 'fit' or 'helpfulness'"; that is, the expert's testimony must help "the trier of fact to understand the evidence or to determine a fact in issue." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 n.12 (3d Cir. 2000) (citing *Daubert*, 509 U.S. at 591–92).  To determine whether an expert's conclusions are reliable, "a district court must . . . determine whether [the conclusions] could reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999).  Fundamentally, an expert must have "good grounds" for his opinions.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 732 (3d Cir. 1994) (citing *Daubert*, 509 U.S. at 590).

**B.    Summary Judgment**

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Therefore, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Owens Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 248 (1986).  There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production, *Anderson*, 477 U.S. at 252, and may not "rely merely upon bare assertions, conclusory allegations or suspicions," *see Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982), or arguments made in briefs, as those "are not evidence," *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

When determining the existence of a genuine issue of material fact, a court must "examine the evidence of record in the light most favorable to the party opposing summary judgment[] and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court need only decide whether "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

III.   **DISCUSSION**

  A.   **Motion to Preclude**

In its Motion to Preclude, the City seeks to strike the opinions and testimony of expert Shaun T. Santos on two grounds:  Santos's opinions (1) do not "fit" the facts of this case because they are "not relevant to the ultimate issues of the case," ECF No. 70 at 10, and (2) are "inherently unreliable" because they are not supported with "cognizable, accepted principles and methodology," *id.* at 16.  Plaintiff provides no meaningful response.  Instead, Plaintiff's response is filled with a litany of complaints regarding the City's litigation tactics, *see, e.g.*, ECF No. 76 ¶¶ 8–9 (complaining that the City objected to discovery requests "at every turn"), and conclusory statements about the purported usefulness of Santos's testimony, *see, e.g.*, *id.* ¶ 9 ("There is no question that the expertise, experience, knowledge, education, writings, training and research that plaintiff's expert presents will assist the jury in understanding and explaining police policy and procedure . . . .").

Upon its own review of Santos's report (ECF No. 70-1), and as further detailed below, the Court finds that Santos offers some opinions that are both reliable and relevant—namely, those opinions on the inadequacy of internal affairs investigations and the City's protection of NFU Officers, as expressed within paragraphs 334–94 of his report.  Santos will be permitted to testify and opine on those opinions *only*; the remainder of his report will be excluded.

  1.   **Santos's opinions on the inadequacy of internal affairs investigations and the City's protection of the NFU Officers are relevant to Plaintiff's municipal liability claim.**

In the *Daubert* context, "relevance has been described as one of 'fit' or 'helpfulness'"; that is, the expert's testimony must help "the trier of fact to understand the evidence or to determine a fact in issue."  *Oddi*, 234 F.3d at 144 n.12 (citing *Daubert*, 509 U.S. at 591–92).  Put differently,

"the expert testimony must fit the issues in the case"—it must "be relevant for the purposes of the case." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

Here, Santos's opinions and testimony in three sections of his report—specifically, the sections entitled (1) "Custom and Practice of Conducting Inadequate Internal Affairs Investigations," (2) "Internal Affairs Investigations Were Routinely Compromised," and (3) "NFU Officers Were Protected"—are relevant to this case. ECF No. 70-1 ¶¶ 334–94. In those three sections, Santos opines that "the [Philadelphia Police] Department has failed to conduct adequate Internal Affairs Investigations to remedy [rampant police misconduct], even after being on notice that internal controls have consistently been inadequate to address the corruption," *id.* ¶ 334; that there is a "custom and practice of compromising Internal Affairs investigations" given evidence showing that Philadelphia police officers were routinely able to, among other things, "access[] Internal Affairs [i]nvestigators prior to their interview" and "shar[e] their [Internal Affairs] testimony transcripts [with each other] upon being interviewed," *see id.* ¶¶ 367–79; and that "Philadelphia Police NFU officers felt that they were protected from any adverse consequences for any misconduct," *see id.* ¶¶ 380–94. This testimony is plainly relevant to the thrust of Plaintiff's municipal liability claim that "[i]t was the policy and/or custom of the City of Philadelphia to cover-up and avoid detection of improper and illegal police activity." ECF No. 16-2 ¶ 77.

However, the Court agrees with the City that the remainder of Santos's report is unhelpful to the trier of fact in understanding the evidence or issues in this case.[6] For example, Santos's

---

[6] In fact, much of Santos's report reads as a "one-size-fits-all" report that he only slightly tweaks to fit this case. The Court cautions both Plaintiff's counsel and Santos against taking this approach in the future. Such an approach not only burdens courts, as it requires courts to review the expert's report with a fine-tooth comb in hopes of finding the relevant or helpful portions, but it also damages the expert's credibility.

longwinded discussion of the "Rule of Two"—i.e., that it is a best practice for two officers to observe a confidential informant ("CI"), *see* ECF No. 70-1 ¶ 149—is entirely irrelevant to Plaintiff's municipal liability claim.  Plaintiff's municipal liability claim turns on Walker's underlying constitutional violation:  that he lied about witnessing a CI conduct a controlled buy with Plaintiff and swore out an affidavit of probable cause based on that lie.  Whether or not Walker conducted the controlled buy alone is not at issue.  Similarly, Santos's opinion that "the failure to conduct periods of surveillance and/or [to] access available Police Department, RMV, and utility databases in an attempt to identify any connection between Brittney Mills and the target location, 747 N. 37th St Philadelphia, PA, is not consistent with generally accepted practices, trainings, and law enforcement policies nationwide," *id.* ¶ 138, has nothing to do with this case.  There is no claim that the Philadelphia police should have used police, RMV, or utility databases to identify a connection between Mills and the "target location."  Therefore, the Court will strike any portions of Santos's report that do not relate to the inadequacy of internal affairs investigations and the City's protection of the NFU Officers as contained within paragraphs 334–94 of his report.

## 2. Santos's opinions on the inadequacy of internal affairs investigations and the City's protection of the NFU Officers are reliable.

For a party's expert opinion or testimony to be deemed reliable, the party must demonstrate that it is "more likely than not" that the expert's testimony and opinions "reflect[] a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702.  Put differently, the expert's opinions and testimony "must be grounded in acceptable principles and methodology and provide the substantive rationale in detail with respect to the basis and reasons for the proffered opinions."  *Torain v. City of Phila.*, No. CV 14-1643, 2023 WL 174952, at *5 (E.D. Pa. Jan. 12, 2023) (citations omitted).  An expert must provide an "objective anchor for his conclusions" beyond mere training and experience.  *See Booth v. Black & Decker, Inc.*, 166 F.

Supp. 2d 215, 221–22 (E.D. Pa. 2001) (excluding expert testimony because the expert did not offer any source for his conclusion beyond "his own training and experience").

Here, the Court finds that it is more likely than not that Santos's proffered testimony and opinions relating to the inadequacy of internal affairs investigations and the City's protection of the NFU contained within paragraphs 334–94 of his report are reliable.  Santos's opinions are not anchored merely in his training or experience; rather, Santos reaches these opinions by applying his decades of experience in law enforcement, training and skills to the facts of this case based upon materials from the record, including Walker's "IAPro Alert entries,"[7] as well as relevant deposition testimony, including testimony by Walker, Reginald Graham (another NFU officer), Debra Frazier (Captain of the NFU from 2009 to 2012), and Edward McCann, Jr. (a former Assistant District Attorney).  *See* ECF No. 70-1 ¶¶ 334–94; ECF No. 68-2 ¶ 44.  For example, in opining that the City had a "Custom and Practice of Conducting Inadequate Internal Affairs Investigations," Santos provides an overview of Walker's IAPro alerts, and then explains that "the sheer number of alerts warranted some type of supervisory intervention beyond a cursory review"—but that after reviewing Walker's deposition testimony, it appeared that "Walker had been disciplined only once while assigned to NFU."  ECF No. 70-1 ¶ 364.

Santos also provides a robust and substantive rationale for his opinion that NFU officers were "protected."  *See id.* ¶ 380.  He cites to many portions of Walker's testimony, *see id.* ¶ 381 (noting Walker's testimony that his squad was "untouchable"), Graham's testimony, *see id.* ¶ 382 (summarizing Graham's testimony that after he told the Police Commissioner's Office that NFU

---

[7] As Santos explains in his report, "IAPro is a commercially available internal investigation web-based platform utilized by a number of law enforcement agencies nationwide to manage internal investigations" and can be used to sort through "specific data such as . . . civilian complaints" against police officers.  ECF No. 70-1 ¶ 356.  In his report, Santos provides an overview of civilian complaints lodged against Walker.  *See id.* ¶¶ 356–64.

officers were "subverting probable cause requirements," a sergeant responded that these NFU officers would "be put back on the street" anyway), and Frazier's testimony, *see id.* ¶ 383 (citing Frazier's testimony that Deputy Commissioner William Blackburn "refused" to disband a squad of NFU officers that Frazier suspected were engaging in misconduct due to a "social relationship" between Blackburn and one of the NFU officers).

While Santos's method of applying his experience and training to materials in the record may not be "a formal, testable method," it is one that is commonly "used by police practices experts and accepted by the courts." *See Roberson v. City of Phila.*, No. CIV. A. 99-3574, 2001 WL 210294, at *4 (E.D. Pa. Mar. 1, 2001) (finding municipal liability expert opinion reliable where expert "reaches his conclusions by applying his significant experience, training and skills" to "numerous materials" provided to him, including deposition transcripts and various Philadelphia Police Department memoranda and directives); *see, e.g.*, *Jefferson v. Lias*, Civ. No. 15-1086, 2022 WL 4550144, at *8 (D.N.J. Sept. 28, 2022) (finding municipal liability expert's opinions reliable because they were based upon "an analysis of the deposition testimony and documentary evidence produced in this case—including hundreds of pages of CAP investigation reports and EPD internal affairs statistics—as well as his considerable law enforcement experience").

It is worth noting that the City lodges only one specific objection to the opinions contained within paragraphs 334–94 of Santos's report: the fact that Santos cites a Wikipedia article in paragraph 350. *See* ECF No. 70 at 15-16. That may indeed be an appropriate point to raise on cross-examination. But given the numerous other sources that Santos cites and in which he grounds his opinions, one cite to one Wikipedia article is not sufficient to warrant exclusion under *Daubert*. *See Keller v. Feasterville Fam. Health Care Ctr.*, 557 F. Supp. 2d 671, 682 (E.D. Pa. 2008) (refusing to exclude expert's opinion as unreliable where it was "based on his review of the

medical records and numerous other sources of information including pathological evidence, his experience as a pathologist . . . , and his board certification in anatomic and clinical pathology" and instead holding that "[a]ny weaknesses or inadequacies in the facts and assumptions of [the expert's] conclusions can be highlighted through effective cross-examination."). Accordingly, the Court will deny the motion to preclude as to any of Santos's opinions or testimony on the inadequacy of internal affairs investigations and the City's protection of NFU Officers. The remainder of Santos's proffered opinions and testimony will be excluded.

### B.    Motion for Summary Judgment

The only live claims in this case following the Court's October 5, 2023 Order (ECF No. 103) are those pending against the City: Plaintiff's state law claim of negligent hiring, retention, and supervision (Count XV) and municipal liability claim (Count XIV). The City moves for summary judgment on both counts and asks this Court to enter judgment in its favor. ECF Nos. 68, 68-3 at 1, 17. For the following reasons, the Court will grant summary judgment on Plaintiff's negligent hiring, retention, and supervision claim (Count XV), but declines to do so on Plaintiff's municipal liability claim (Count XIV).

### 1.    Negligent Hiring, Retention, and Supervision Claim (Count XV)

With respect to Count XV, the City argues that Plaintiff's claim of negligent hiring, retention, and supervision—that the City "failed to exercise reasonable care in the hiring, retention and supervision of the defendant Police Officers with such failure being the direct and proximate cause of Plaintiff's injuries," ECF No. 16-2 ¶ 84—is barred by Pennsylvania's Political Subdivision Tort Claims Act (the "Tort Claims Act"). ECF No. 68-3 at 8–9. The Court agrees.

With certain specified exceptions, the Tort Claims Act immunizes a "local agency," which includes the City of Philadelphia, from liability for "any damages on account of any injury to a

person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. C.S.A. § 8541; *see Staples v. City of Phila.*, No. CV 22-2118, 2023 WL 4440278, at \*7 (E.D. Pa. July 10, 2023) ("It is well-established that the City of Philadelphia is a 'local agency' within the meaning of these provisions." (citing *Weinerman v. City of Phila.*, 785 F. Supp. 1174, 1178 (E.D. Pa. 1992), *Walsh v. City of Phila.*, 526 Pa. 227, 585 A.2d 445, 450 (Pa. 1991))). These exceptions are the operation of motor vehicles; the care, custody and control of real property, personal property, and animals; sexual abuse; and the maintenance of utility service facilities, streets, trees, street lighting, traffic controls, and sidewalks. 42 Pa. C.S.A. § 8542(b); *Wakshul v. City of Phila.*, 998 F. Supp. 585, 588 (E.D. Pa. March 24, 1998) (explaining that the Tort Claims Act provides "absolute immunity to the City of Philadelphia from tort liability, except [for the statutorily] enumerated [exceptions]").

Here, Plaintiff's negligent hiring, retention, and supervision claim does not fall under any of these exceptions. *See, e.g.*, *Clark v. City of Phila.*, No. CIV.A. 13-2204, 2014 WL 4812182, at \*4 (E.D. Pa. Sept. 26, 2014) (dismissing Plaintiff's claim of negligent training and supervision against the City of Philadelphia because it does not fall within any of the enumerated exceptions of the Tort Claims Act); *Thomas v. Cianfrani*, No. CIV.A. 01-3096, 2009 WL 1704471, at \*4 & n.10 (E.D. Pa. June 17, 2009) (concluding that the Tort Claims Act affords immunity to City of Philadelphia against claims of negligent hiring, retention, and supervision of police officers). Therefore, Plaintiff's negligent hiring, retention, and supervision claim fails as a matter of law.

### 2.      Municipal Liability (Count XIV)

A municipal liability claim "against the City may proceed in two ways": (1) "Plaintiff may show that an unconstitutional policy or custom of the City caused [her] injuries," or (2) "Plaintiff may show that [her] injuries were caused by a failure or inadequacy by the municipality that

reflects a deliberate or conscious choice." *McIntyre v. Liciardello*, No. 13-2773, 2020 WL 605717, at *13 (E.D. Pa. Feb. 7, 2020) (citing *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019)) (additional citations omitted). "The latter liability encompasses a municipality's failure to train, supervise, or discipline its employees." *See id.* (citing *Forrest*, 930 F.3d at 105). A plaintiff may plead both theories in the alternative, and if she does, the Court must address them separately. *See, e.g.*, *id.* (analyzing the plaintiff's first theory—that the City had a "custom of municipal acquiescence in misconduct"—and the plaintiff's second theory—that "the City is liable for failing to train Officers 'against a code of silence,' and failing to supervise and discipline 'rampant illegal conduct in narcotics investigations'"—separately) (citation omitted).

Here, Plaintiff pleads both theories of municipal liability:  that (1) "[i]t was the policy and/or custom of the City of Philadelphia to cover-up and avoid detection of improper and illegal police activity," ECF No. 16-2 ¶ 77, and (2) the City failed to "sufficiently supervise against, train and/or retrain against, and discipline against illegal police activity" and against a "code of silence," *id.* ¶¶ 78, 80.[8]

---

[8] In the operative complaint, Plaintiff's second theory is pled as follows:  "It was the policy and/or custom of the City of Philadelphia to fail to sufficiently supervise against, train and/or retrain against, and discipline against illegal police activity," ECF No. 16-2 ¶ 78, and "[i]t was the policy and/or custom of the City of Philadelphia to inadequately supervise and train its Police Officers, including the defendant Officers, against a code of silence or 'blue code' of Officers," *id.* ¶ 80. However, as Judge Diamond recognizes in *McIntyre*, the Third Circuit has held that a theory that the City has maintained a "policy" or "custom" of failing to supervise, train, or discipline its police officers "has no basis in law." *See McIntyre*, 2020 WL 605717, at *13 ("In reversing a summary judgment grant in favor of a municipality on a *Monell* claim, the Third Circuit recently emphasized that "policy or custom" and "failure to train" are distinct and must be treated accordingly.") (citing *Forrest*, 930 F.3d at 107 ("[T]he bare notion that a custom or policy of 'essentially unsupervised' officers led to [plaintiff's] injury has no basis in law.")).

Therefore, Plaintiff's second theory is appropriately reframed as alleging that the City's failure to supervise, discipline or train its officers amounted to deliberate indifference to the constitutional rights of its citizens. *See, e.g.*, *Forrest*, 930 F.3d at 107 (explaining that the plaintiff's theory that Camden maintained a policy or custom of inadequately supervising and training its police officers

The City argues that summary judgment is appropriate on both.  ECF No. 68-3 at 12–17. On the first "policy or custom" theory, the City argues that Plaintiff has adduced no evidence of a municipal "policy" or "custom" that caused her alleged harm.  *Id.* at 12–13.  On the second "failure to train, supervise, and discipline" theory, the City argues that Plaintiff has not adduced sufficient evidence to establish that a failure to train, supervise and/or discipline was the moving force behind her alleged constitutional violation.  *Id.* at 13–17.

In response to the City's arguments, Plaintiff primarily relies upon Judge Diamond's decision on the City's summary judgment motion in the related case of *McIntyre*, 2020 WL 605717, at *5.  *See* ECF No. 95-1 at 3–6, 16 ("Plaintiff adopts the Argument and Legal Standards as set forth in . . . the Honorable Paul Diamond's Decision entered in *McIntyre*.").  As the parties understand—and as the City recognizes in its opening brief—*McIntyre* was "litigated as the bellwether case" for hundreds of cases arising out of alleged misconduct by members of the NFU, including this one.  ECF No. 68-3 at 15; *see McIntyre*, 2020 WL 605717, at *1.

The Court largely agrees with Plaintiff that Judge Diamond has sufficiently vetted the municipal liability claim against the City arising from the NFU's misconduct through his analysis in *McIntyre*.  After a review of Judge Diamond's decision in *McIntyre* and the record evidence in this case, the Court will deny summary judgment on Plaintiff's first "policy or custom" theory and the portion of Plaintiff's second theory that relates to the City's "failure to supervise and discipline."  However, the Court will grant summary judgment on the portion of Plaintiff's second theory that relates to the City's "failure to train."

---

is not legally cognizable, but when "properly considered," sounds in a theory that "Camden's failure to supervise, investigate, and train its officers amounted to deliberate indifference").

Before beginning its analysis, the Court must first explain what evidence it will consider. After a review of the docket and the exhibits appended to the parties' briefings, the Court will consider not only the evidence submitted with the parties' briefings (ECF Nos. 68-2, 68-4–13, 95-2–42), but also the record underlying Judge Diamond's decision in *McIntyre*.[9] As the parties acknowledge, the discovery conducted in *McIntyre* was intended to be used in its related cases. Plaintiff says so in her opposition brief, *see* ECF No. 95-1 at 5, 10–11, and the City also concedes, as stated by the City in prior correspondence to this Court, that the "*Monell* discovery in [the *McIntyre* case] is also applicable here." ECF No. 95-2 at 1 (attached hereto as Exhibit A).

To survive summary judgment on either of her theories, Plaintiff must first show an underlying constitutional violation. *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 658 (1978). Here, the City does not dispute that Walker violated Plaintiff's constitutional rights. *See generally* ECF No. 68-3. It is undisputed that Walker obtained a search warrant for 747 N. 37th Street by relying on false information. ECF No. 102 at 8 (citing ECF 66 ¶¶ 18-19, ECF 74 ¶ 6). Specifically, Walker admitted that he falsely claimed to have observed a CI make a controlled buy from a woman matching Mills's description; he swore out an affidavit of probable cause based on that fabricated information in support of a search warrant; and upon execution of that warrant, Plaintiff was arrested. ECF No. 66, Ex. E (Walker Dep.) at 827:3–829:13, Ex. L, Ex. H; ECF No. 102 at 8 & n.9, 10–13. Such conduct is unequivocally a violation of Plaintiff's constitutional rights. U.S. Const. Amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

---

[9]   The Court recognizes and thanks Judge Diamond for his hard work in *McIntyre*—both for managing discovery for the hundreds of related cases arising out of the NFU's alleged misconduct (including this one), which is no easy feat, and for his comprehensive analysis in his summary judgment opinion, *see* 2020 WL 605717, at *13–15.

no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

### i.      Policy or Custom

To establish liability on her first theory, Plaintiff must show that "an unconstitutional policy or custom" of the City caused her injuries.  *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019).  A "policy" is an official proclamation or edict of a municipality, while a "custom" is a practice that is "so permanent and well settled as to virtually constitute law."  *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citations omitted).  There is no evidence of an unconstitutional "policy," or official proclamation or edict, in the record; to the contrary, Plaintiff argues that Walker violated official policies of the Philadelphia Police Department that were meant to bar Walker's specific misconduct, *see, e.g.*, ECF No. 95-1 at 1, 3, 8.

However, viewing the relevant evidence in the light most favorable to Plaintiff, and accepting those facts and all justifiable inferences as true, the Court finds that there is sufficient evidence of an unconstitutional "custom" of the City "cover[ing]-up and avoid[ing] detection of improper and illegal police activity," ECF No. 16-2 ¶ 77, for Plaintiff to withstand summary judgment.  For example, there is testimony by Frazier that a chief inspector instructed officers "to operate confidential informants in a totally corrupt way," including by planting drugs on people to "make them confidential informants," and that he "informed the officers that he would take care of any problems that they had."  ECF No. 95-16 (Frazier Dep.) at 89:16-90:3.  There is testimony from former Deputy District Attorney Douglas—who was head of the District Attorney Office's ("DAO") Investigations Division—that Captain Werner (who oversaw the NFU) and then-IAB Inspector Blackburn would "cover" for a NFU officer when he used "bogus probable cause statements" in search warrant affidavits.  ECF No. 95-20 (Douglas Dep.) at 46:4-10; *McIntyre*,

2020 WL 605717, at *5.  And there is testimony that Walker and the other NFU officers in his squad were "untouchable"; even if the IAB received a complaint, someone from IAB would call the officers to forewarn them or "give them a heads up," tell them to "get their stories together," and tell them to "stick to the paperwork."  ECF No. 95-9 (Walker Dep.) at 77:19-78:1; *see also* ECF No. 95-11 (Walker Dep.) at 56:7–23 ("We had [IAB] in the pocket.").

In addition to proving a "custom," Plaintiff must also show that the "custom was the 'proximate cause' of [her] injuries."  *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (citation omitted).  Plaintiff may make such a showing "by demonstrating an 'affirmative link' between the [custom] and the particular constitutional violation" alleged.  *Id.* (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).  Distilled further, this "affirmative link" consists of three prongs: (1) the City's awareness "of similar unlawful conduct in the past"; (2) its failure "to take precautions against future violations"; and (3) "that this failure, at least in part, led to their injury."  *McIntyre*, 2020 WL 605717, at *15 (citing *Bielevicz*, 915 F.2d at 851 ("[T]o sustain a § 1983 action against the City, plaintiffs must [] establish a municipal custom coupled with causation—i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury.")).

Here, Plaintiff has adduced sufficient evidence on all three prongs.  First, the record shows that the City was aware of similar unlawful conduct by NFU officers.  As noted by Judge Diamond in *McIntyre* and as acknowledged by the City itself in its opening brief, Liciardello (a NFU officer and member of Walker's squad) was found responsible for misconduct nine times, including five times for executing unlawful searches or seizures.  *See* 2020 WL 605717 at *14; ECF No. 68-3 at 15.  Nor does the City contest that Walker himself had a significant number of complaints leading

up to Plaintiff's wrongful arrest; rather, the City concedes this point.  *See* ECF No. 68-3 at 15 ("The City does not assert – nor could it – that Jeffrey Walker did not have a high number of complaints filed against him in the years leading up to Plaintiff's arrest. During the twenty-one years he worked for the Philadelphia Police Department prior to that arrest, Walker had twenty-four complaints filed against him."); ECF No. 68-2 ¶¶ 39–42.

While the City argues that Walker's prior misconduct is not "similar" enough to the type of conduct alleged by Plaintiff because Walker is "not alleged to have improperly utilized confidential informants to make narcotics purchases," ECF No. 68-3 at 15, the City characterizes Walker's misconduct too narrowly.  Walker admitted that he swore out an affidavit of probable cause based upon fabricated information, and then upon execution of that warrant, Plaintiff was arrested.  ECF No. 102 at 8, 13 (citing ECF 66 ¶¶ 18-19, Ex. H; ECF 74 ¶ 6).  In the years preceding Plaintiff's false arrest, Walker had been repeatedly accused of similar misconduct: his record shows eight complaints of illegal searches and six complaints of false arrest.  ECF No. 68-12; *see Beck*, 89 F.3d at 973 (pattern of written complaints similar in nature to the alleged constitutional injury sufficient for reasonable jury to conclude policymaker knew or should have known of violations).[10]  On this record, the Court finds that there is sufficient evidence to raise a genuine issue of material fact on the awareness prong.

On the second prong, the record sufficiently demonstrates that, even knowing of the rampant misconduct by the NFU, the City nonetheless failed to take precautions.  As noted by Judge Diamond in *McIntyre*, the record shows that high level officials in the DAO "knew about

---

[10] The City also argues that Walker only admitted to wrongdoing on three complaints but "[t]he remaining twenty-one resulted in no findings of wrongdoing."  ECF No. 68-3 at 15.  That argument falls flat in light of the exact allegations at issue.  After all, if the City maintained a custom of "cover[ing]-up and avoid[ing] detection of" Walker's (and other officer) misconduct as Plaintiff alleges, ECF No. 16-2 ¶ 77, logic dictates that his record would reflect repeated acquittals.

the IAB's complicity in Defendant Officers' wrongs but took no corrective action."  2020 WL 605717 at *14 (finding that the DAO had received "numerous complaints against [the] NFU" and that "senior DAO prosecutors believed NFU Officers routinely committed misconduct" yet continued to rely on these officers in hundreds of prosecutions).  Additionally, there is evidence that even when various supervisors raised NFU misconduct to Deputy Commissioner Blackburn, he refused to intervene.  For example, when Captain Frazier "had concerns about the operations in Walker's squad" and made a recommendation to separate the officers in his squad, Blackburn ultimately rejected the recommendations because "he felt [the officers] were the best squad in the unit."  ECF No. 68-2 ¶ 49.  And when McCann (a former Assistant District Attorney) raised NFU officer misconduct to Blackburn, Blackburn simply "defended the officers."  ECF No. 95-17 (McCann Dep.) 16:18–17:2, 20:19–22, 21:15–17.  Moreover, Walker testified that Blackburn was aware—that it was "obvious"—that NFU officers frequently went "in and out of houses without warrants," and yet Blackburn did nothing.  ECF No. 95-11 (Walker Dep.) 54:3–24.  Lastly, there is evidence that even when the City Solicitor was told that the NFU Officers were "dirty," nothing happened—the City Solicitor gave the NFU officers a "heads-up and that was it," because they were "protected."  ECF No. 95-9 (Walker Dep.) 78:5–79:21.

On the third prong, the Court finds that there is sufficient evidence to show that the City's failure to address the NFU officers' misconduct led to the injury suffered by Plaintiff.  As noted, the injury suffered by Plaintiff—that is, Walker's fabrication of probable cause and the ensuing false arrest of Plaintiff—is the exact harm that had been perpetrated repeatedly by NFU officers, including Walker.  As detailed above, Walker had been accused of false arrest six times and illegal searches eight times before Plaintiff's arrest.  Accordingly, given the record at hand, the Court finds that the issue of proximate causation should be left to the jury.  *Bielevicz*, 915 F.2d at 851

("As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury.").

As a final attempt to justify summary judgment, the City attempts to distinguish this case from *McIntyre* by arguing that "[t]he record evidence in this case is in marked contrast to that found to be sufficient to withstand summary judgment in the *McIntyre v. Liciardello* matter." ECF No. 68-3 at 15. The Court finds this argument entirely unavailing. As discussed, the City has already represented to this Court that "the *Monell* discovery in [*McIntyre*] is also applicable here," ECF No. 95-2 at 2—and Plaintiff submitted much of that same discovery to this Court in opposition to the City's motion, as cited throughout this analysis. The City even went so far as to note in its October 13, 2021 letter that it "ha[d] no intention to file a motion for summary judgment" in this case because "Judge Diamond already decided the City's Motion for Summary Judgment in *McIntyre*," so "it would be an inefficient use of judicial and municipal resources to re-litigate the same issues involving the same evidentiary record." *Id.* (emphasis added). Despite this letter being appended to Plaintiff's opposition brief, *id.*, the City makes no attempt to explain its bait-and-switch in its reply, *see* ECF No. 100.

For the reasons articulated above, the Court will deny summary judgment as to Plaintiff's "policy or custom" theory.

### ii.      Failure to Train, Supervise, and Discipline

Turning now to Plaintiff's second theory, a city can only be liable for a failure to supervise, discipline, and train where such failure "reflects a 'deliberate' or 'conscious' choice by a municipality" that "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 389 (1989). To demonstrate "deliberate indifference," Plaintiff must show that "(1) municipal policymakers know

that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Forrest*, 930 F.3d at 106 (citing *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999)).

The Court will deny summary judgment as to the failure to supervise and discipline portion of Plaintiff's theory. Given the evidence laid out above, a reasonable jury certainly could find that the City's failure to supervise or discipline NFU officers, including Walker, reflects a "deliberate" or "conscious" choice by the City. The record is replete with evidence of a failure to supervise or discipline police officers against illegal police activity or a "code of silence." As noted above, Deputy Commissioner Blackburn refused to intervene even once he was put on notice of the NFU's misconduct. ECF No. 68-2 ¶ 49; ECF No. 95-17 (McCann Dep.) 16:18–17:2, 21:15–17. Moreover, Walker testified that his supervisor knew that Walker had not followed protocols, but did nothing about it; in fact, Walker testified that "every long-term supervisor . . . either turned a blind eye [to] or participated in what [Walker] was doing." ECF No. 95-11 (Walker Dep.) 40:14–22, 21:12–22:7. And when asked under oath if Walker was "ever afraid of being disciplined," Walker responded with one word: "never." *Id.* at 60:22–24.

Moreover, there is sufficient evidence in the record to establish all three elements of "deliberate indifference." First, it cannot be disputed that City municipal policymakers know that police officers will confront situations in which they obtain search warrants based on probable cause and use observations of controlled buys by confidential informants to justify probable cause. Second, as noted above, there was a history of police officers mishandling these types of situations: Liciardello was found responsible for misconduct nine times, including five times for executing unlawful searches or seizures, *see* 2020 WL 605717 at *14; ECF No. 68-3 at 15, and Walker was

accused of illegal searches eight times, ECF No. 68-12. Third, such misconduct—falsely attesting to facts to justify probable cause—clearly deprives a citizen of their Fourth Amendment rights.

However, summary judgment is appropriate on Plaintiff's "failure to train" theory. To succeed on a failure to train claim, Plaintiff "must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." *Reitz v. Cty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997). Plaintiff has failed to identify any specific training failure, let alone adduce any evidence of deficient trainings. To the contrary, Walker provided testimony demonstrating that he knew what the correct protocols were, which indicates that official training was not the problem. *See, e.g.*, ECF No. 95-11 at 20:6–8 (testifying that it was a "mistake" to "act[] solely on what the confidential informant told [him]"). Nor is there any evidence suggesting that additional training would have made any difference; after all, Walker knew—and admits—that his conduct was illegal. *See id.* Therefore, as this Court found in *McIntyre*, "'there is no proof from which to infer that implementing' different training practices 'would have made any difference.'" 2020 WL 605717, at *15 (quoting *Forrest*, 930 F.3d at 109). For this reason, the Court will grant summary judgment as to the failure to train portion of Plaintiff's theory.

## IV.    <u>CONCLUSION</u>

For the reasons stated above, the Court grants in part and denies in part the City's Motion to Preclude (ECF No. 68). The Court will deny the motion to preclude any testimony or opinions related to the following three enumerated sections in Santos's report: (1) "Custom and Practice of Conducting Inadequate Internal Affairs Investigations," (2) "Internal Affairs Investigations Were Routinely Compromised," and (3) "NFU Officers Were Protected." ECF No. 70-1 ¶¶ 334–94. The remainder of Santos's opinions and testimony will be excluded.

Additionally, the Court grants in part and denies in part the City's Motion for Summary Judgment (ECF No. 70).  The Court will grant summary judgment on Plaintiff's negligent hiring, retention, and supervision claim (Count XV) and the "failure to train" theory as it relates to Plaintiff's municipal liability claim (Count XIV).  Summary judgment is denied as to the rest.

An appropriate Order will follow.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**

# EXHIBIT A



# CITY OF PHILADELPHIA

LAW DEPARTMENT
One Parkway
1515 Arch Street
Philadelphia, PA 19102-1595
**DIANA P. CORTES**
Philadelphia City Solicitor
(215) 683-5003
diana.cortes@phila.gov

**ANNE B. TAYLOR**
Chief Deputy City Solicitor
Civil Rights Unit
(215) 683-5381
anne.taylor@phila.gov

October 13, 2021

The Honorable Berle M. Schiller
Senior United States District Court Judge
United States Courthouse, Rm 13613
601 Market St.
Philadelphia, PA 19106

Via email: Jean_Pennie@paed.uscourts.gov

Re: *Mills v. City of Philadelphia, et al.*, 14-cv-593

Dear Judge Schiller,

The following provides some brief background and context for the discovery issue raised to the Court, and then addresses the substance of the three sought depositions.

Plaintiff Brittney Mills filed suit on January 27, 2014, alleging that, on January 5, 2011, she was wrongfully arrested as a result of observations made by Defendants Jeffrey Walker, Michael Alice, and Timothy Dunne. On that date, Officer Alice and Dunne were patrol officers, and shared their observations of narcotics activity with Jeffrey Walker who was, at that time, a member of the Narcotics Field Unit. Plaintiff contends that she was visiting the house at which she was arrested, and that Officer Walker lied when he testified that Plaintiff possessed and sold drugs. Am. Compl. ¶¶ 10-18. Plaintiff entered into a negotiated guilty plea on August 21, 2012, subsequent to which, on December 6, 2013, her plea was vacated and her case nolle prossed. *Id.* ¶¶ 18, 21. As a result of her arrest and conviction, Plaintiff was incarcerated for five days before making bail, and was on probation for two years. *Id.* ¶¶ 16, 18. In her Amended Complaint, Plaintiff named as defendants the officers who observed the narcotics activity (Walker, Alice, Dunne), the officers who participated in the execution of the search warrant (Liciardello, Spieser), and the City of Philadelphia. *See generally id.*

Discovery has thus far included seven depositions – that of Plaintiff, that of five officer defendants, and that of Lieutenant Otto, a supervisor in the Narcotics Field Unit. Plaintiff also has been provided the entire production from the first bellwether NFU case, *McIntyre v. Liciardello*, comprising over thirteen thousand pages of material. Plaintiff has also indicated that she has access to the depositions taken in that case, notably of retired Commissioner Charles Ramsey and Chief Inspector Christopher Flacco (who oversaw the Internal Affairs Department at

Acknowledging that Judge Diamond already decided the City's Motion for Summary Judgment in *McIntyre*, and that the *Monell* discovery in that case is also applicable here, the City takes the position that it would be an inefficient use of judicial and municipal resources to re-litigate the same issues involving the same evidentiary record. Accordingly, to the extent the evidentiary record on *Monell* remains identical to that in *McIntyre*, the City has no intention to file a motion for summary judgment. For the avoidance of doubt, however, in the event Plaintiff seeks and/or obtains additional *Monell* discovery beyond that which was adduced in *McIntyre*, the City submits that it should then likewise have the opportunity to further develop the record, and to file a motion if that changes the landscape.

To address Plaintiff's contention that the *Monell* issue is "more or less dead," the City simply notes that its decision to refrain from filing a dispositive motion should in no way preclude it from mounting a defense at trial. In the event this matter proceeds to trial, it should proceed as all other cases do, allowing all remaining Defendants to have the claims against them adjudicated by a jury.

Finally, in light of the undersigned's recent return from vacation, the parties will be conducting their Rule 26(f) conference as soon as possible, following which time a proposed scheduling order will be submitted to the Court.

Respectfully submitted,

/s/ Jon Cooper
Jon Cooper, Esq.
Counsel for Defendant City of
Philadelphia

cc:  Margaret Boyce Furey, Esq., Counsel for Plaintiff (via email)
John Gonzales, Esq., Counsel for co-Defendants (via email)